# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MELVIN RAINEY,** | **Civil Action No. 18-10271 (SDW)** |
| **Petitioner** | |
| **v.** | **OPINION** |
| **GEORGE ROBINSON, et al.,** | |
| **Respondents** | |

**WIGENTON**, District Judge:

Presently before the Court is the petition for writ of habeas corpus under 28 U.S.C. § 2254 ("Petition") by Petitioner Melvin Rainey, a New Jersey state prisoner, challenging his conviction for aggravated manslaughter, leaving the scene of a fatal accident, endangering an impaired or helpless person, hindering, and tampering with evidence. (ECF No. 1). Respondents oppose the Petition. (ECF No. 9).[1] The proceedings were stayed on April 25, 2022 to allow Petitioner to exhaust certain claims in the state courts (ECF No. 25) and were reopened on June 5, 2023. (ECF No. 28). Petitioner submitted a supplemental brief, (ECF No. 33), and Respondents filed a supplemental answer, (ECF No. 35).

This Court will determine the Petition on the briefs pursuant to Federal Rule of Civil Procedure 78(b). For the following reasons, the Petition is denied, and Petitioner is denied a certificate of appealability.

---

[1] Respondents' exhibits were filed at Docket Entry No. 8 and are referred to herein by the docket and page numbers assigned by the Court's Case Management Electronic Case Filing system, CM/ECF.

# I. BACKGROUND

On or about April 8, 2008, Petitioner was charged in a five-count indictment in the Superior Court of New Jersey, Passaic County with aggravated manslaughter, leaving the scene of a fatal accident, endangering an impaired or helpless person, hindering, and tampering with evidence. (ECF No. 1-2 at 2).  The Superior Court of New Jersey, Appellate Division ("Appellate Division") made the following findings of fact on direct appeal:[2]

> Officer Jessica Amarante of the Paterson Police Department testified she responded to a report of an unresponsive female at defendant's home around 12:26 p.m. on November 23, 2007.  As she approached the home in her car, defendant "flagged" her down.  Defendant told the officer he found the woman in his 1998 Ford Explorer SUV when he got in to take his daughter to the doctor.

> Officer Amarante testified the woman was lying face down in the back of the SUV, which had the seats folded down.  Her "jacket was ripped in the back with feathers coming out and her pants were unzippered and her belt was unbuckled."  The woman was pronounced dead at the scene.

> Defendant told Officer Amarante he had parked the car at 5:00 a.m. on November 21 and had not returned to it until he went to take his daughter to the doctor on November 23.  He stated he did not know the woman or how she got into his car.  Officer Amarante called for other officers and detectives to come to the scene.

> Detective Jack DeSalvo testified he was the lead detective assigned to the case.  When he arrived at defendant's home shortly before 1:00 p.m., the SUV had been "cordoned off with caution tape."  The detective looked inside the SUV and saw that the woman had blood coming out of her nose and mouth area.  She also "had an abrasion on the back of her top portion of her buttocks."  There were "feathers strewn about the rear of the cargo area as well as on her."

> Detective DeSalvo asked defendant "what he knew about this woman and how she got there."  Defendant stated he had parked the

---

[2] This Court defers to the state courts' factual determinations pursuant to 28 U.S.C. § 2254(e)(1) and adopts the facts as set forth by the Appellate Division in its direct appeal and collateral review opinions.

SUV around 5:00 a.m. on November 21 and did not return to it until he "went outside to get a cigarette from the truck. That's when he discovered the female inside the back of the truck [.]" Defendant also told the detective "he poked her a few times at which time she didn't move and he had his wife call the [p]olice."

Although the SUV was registered to defendant's son, Jamar, defendant told the detective he drove it "almost exclusively." Defendant and Jamar gave the detective permission to search the SUV. Defendant stated the SUV had not been moved since he parked it on November 21.

Detective DeSalvo asked defendant if he would come to headquarters to answer some questions about the incident and how the woman got in the SUV. Defendant agreed to do so. Defendant was neither arrested nor handcuffed. He was transported to the station in a police car.

At the station, Detective DeSalvo was joined by Detective Rafael Fermin and they spoke with defendant in an interview room. The interview began at 3:23 p.m. and was videotaped. The videotape was played to the jury. The detectives spoke to defendant and then left the room twice to confer. After the second break, the detectives determined defendant had become a suspect in a crime and, when they returned to the room at 4:26 p.m., they read him his *Miranda*[3] rights. Defendant asked to speak with an attorney and the interview ended. Defendant was then arrested.

The next day, Detective DeSalvo testified he went to the cell where defendant was being held and advised him of the charges against him. The detective testified defendant stated:

> I might have hit something with my truck that night. I remember hearing a thump of some sort. He stated when he got out of the truck he heard someone moaning. And then he said I could have put someone in the back of my truck, forgot to bring them to the hospital. I was drinking a little.

The SUV was processed by the Crime Scene Unit, which found blood stains in the back of the SUV and on its front undercarriage. DNA testing indicated the blood stains belonged to the victim. The woman's boot had a tire track on it. There were yellow paint

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

scrapings found underneath the running board.  Similar yellow paint scrapings were found on the victim's jacket.

No identification was found on the victim's body.  She was fingerprinted and the police canvassed the area in an attempt to find someone who knew her.  An ad was placed in the newspaper seeking information.  About three or four days later, someone called the detective bureau and identified the victim as Joyce Foster.

Troy Greer saw a newspaper story about the case and came forward with information.  Greer testified he had been at an Elks Club in Paterson on the evening of November 21.  He left the Club with his friend, Michael Williams, between 1:30 a.m. and 2:00 a.m.  As they walked to Greer's car, Greer heard a man, later identified as defendant, speaking to a woman and "saying you better come on. You better get up. I'm going to leave you."  Greer stated it looked like defendant was "trying to get this drunk lady off the ground."

Greer and Williams went over to help defendant, who also appeared drunk and smelled of alcohol.  Defendant had an SUV and it was parked in the middle of the street with the back hatch open. Defendant wanted to put the woman in the rear cargo area of the SUV, but Greer refused and told defendant the woman should be placed in the back passenger seat.  Greer heard the woman moan, but he thought she was drunk.  She had some scrapes on her hip and her pants were "coming down."  Greer thought that was because defendant had been "sliding her" in the road as he attempted to get her into the SUV.

The woman had boots on and her jacket was torn.  When the men picked her up, feathers came out of the jacket. Greer testified the woman was alive and breathing at that time.  After they got her into the SUV, defendant thanked them, shook their hands, and drove off.

Williams gave a similar account at trial.  He testified defendant told them he found the woman "in the street."  The woman was moaning and "complaining about the pain."  She seemed to be "in agony in the street, rolling left to right."  Williams testified Greer told defendant to take the woman to Barnett Hospital and defendant then drove away with the woman in the back seat of the SUV.

*State v. Rainey*, No. A-3457-10T4, 2013 WL 2300989, at *1-3 (N.J. Super. Ct. App. Div. May 28, 2013) ("*Rainey I*").

4

Dr. Zhongxue Hua testified for the State as an expert in the field of forensic pathology. *Id.* at *3. He conducted an autopsy on Foster and found that she "was between two and a half and three times over the legal limit for alcohol and she also had cocaine in her system." *Id.* He identified Foster's cause of death as blunt injury to the torso, finding "external bruising of her left shoulder, back, right knee, and left shin, together with blunt trauma to these and other areas of her body" as well as "nineteen fracture sites on her ribs, a punctured lung and liver damage." *Id.* According to Dr. Hua, Foster "lost 'a large amount' of blood, but not enough to have caused her to suffer a 'quick immediate death.'" *Id.* "He classified Foster's death as 'a homicide,' rather than an accident, because she was not taken to a hospital and because emergency personnel were not called to provide her with medical care." *Id.* Petitioner did not testify and presented no witnesses. *Id.*

A jury convicted Petitioner on all counts in October 2010. (ECF No. 1-2 at 2). The trial court sentenced Petitioner to a total term of 24 years in prison. (*Id.*) Petitioner appealed, and the Appellate Division denied his appeal on May 28, 2013. *Rainey I*, 2013 WL 2300989, at *7. The New Jersey Supreme Court denied Petitioner's petition for certification on December 6, 2013. *State v. Rainey*, 216 N.J. 367 (2013).

On May 10, 2014, Petitioner filed a petition for post-conviction relief ("PCR"). (ECF No. 8-27 at 4-18). The PCR court held oral argument on February 26, 2016, (ECF No. 8-21), and denied PCR relief without an evidentiary hearing on March 18, 2016, (ECF No. 8-28 at 73). Petitioner appealed, (*id.* at 74), and the Appellate Division affirmed the PCR court's decision on December 20, 2017. *State v. Rainey*, No. A-4673-15T4, 2017 WL 6507743, at *3 (N.J. Super. Ct. App. Div. Dec. 20, 2017) ("*Rainey II*"). The New Jersey Supreme Court denied Petitioner's petition for certification on May 21, 2018. *State v. Rainey*, 235 N.J. 376 (2018).

5

## II.  DISCUSSION

### A.  Legal Standard

"The federal habeas statute, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases."  *Shoop v. Hill*, 586 U.S. 45, 48 (2019).  A federal court may entertain a petition for writ of habeas corpus on behalf of a person in state custody pursuant to the judgment of a state court "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent."  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  "[A] state-court decision is an unreasonable application of [the Supreme Court's] clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  *White v. Woodall*, 572 U.S. 415, 426 (2014).  "This means that a state court's ruling must be 'so lacking in justification that

6

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Shoop*, 586 U.S. at 48 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  This Court must presume that the state court's factual findings are correct unless the petitioner rebuts the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict.  *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993).  *See Brown v. Davenport*, 596 U.S. 118, 134 (2022) ("[E]ven a petitioner who prevails under AEDPA must still today persuade a federal habeas court that 'law and justice require' relief.").

**B.  Analysis**

**1.  Denial of Petitioner's Motion to Suppress His Statements (Ground I)**

Petitioner argues that the trial court erred by denying his pre-trial motion to suppress (1) the statements he gave to police at his home; (2) his statement to police at the station before receiving *Miranda* warnings; and (3) the utterance to Detective DeSalvo the morning after Petitioner's arrest.  (ECF No. 1-3 at 12).  He contends that his statements should have been suppressed because the statements he made at his home and while he was detained in the jail cell were not recorded.  (*Id.* at 12-14).  He further argues the police engaged in "question first warn later" tactics in obtaining his statements.  (*Id.* at 16).

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  "*Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally

requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (plurality).

The Appellate Division affirmed the trial court's decision to deny Petitioner's motion to suppress on direct appeal. *Rainey I*, 2013 WL 2300989, at *5. The Appellate Division agreed that Petitioner was not in custody when he gave his statements to police at his home. *Id.* "At that time, defendant was alleging he found the body of a woman in his SUV, did not know her, and did not know how she got there. The police were therefore authorized to engage in general on-the-scene questioning to determine the circumstances of defendant's discovery as part of their fact-finding process." *Id.* It further agreed that Petitioner's recorded statement to police was not a custodial interrogation because he voluntarily agreed to accompany officers to the station and was free to leave at any time. *Id.* It concluded that Petitioner's remark telling Detective DeSalvo that he "might have hit something with [his] truck" had been "voluntarily blurted out" and did not violate *Miranda*. *Id.* (internal quotation marks omitted).

Petitioner challenges the officers' failure to read him his *Miranda* rights prior to speaking with him at his home and upon arrival to the police station.[4] *Miranda* warnings are required "only when the person the police are questioning is in custody." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (citing *Miranda*, 384 U.S. at 468). Law enforcement officers "are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

---

[4] Petitioner also argues that the officers failed to record his statement at his home and while he was in the jail cell, citing New Jersey state law. (ECF No. 1-3 at 13). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[F]ederal habeas corpus relief does not lie for errors of state law." *Id.* (internal quotation marks omitted).

8

"A person is in custody when he either is arrested formally or his freedom of movement is restricted to 'the degree associated with a formal arrest.'" *Willaman*, 437 F.3d at 359 (quoting *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999). In the absence of a formal arrest, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *Id.* (internal quotation marks and citation omitted). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation … ." *Stansbury v. California*, 511 U.S. 318, 322 (1994). Here, the totality of the circumstances does not support a finding that Petitioner was "in custody" while speaking with the officers in his home.

The police were at Petitioner's home because Petitioner directed his wife to report an unconscious woman in his car, and he admitted at the *Miranda* hearing that he expected the officers to ask him questions when they arrived. (ECF No. 8-3 at 24). Petitioner spoke with detectives in his living room, and his son was present during at least part of the conversation. (ECF No. 8-2 at 11). Although not dispositive, "the fact that the incident took place in [Petitioner's] home undermines a claim that he was in custody." *United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004); *see also United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) ("When a person is questioned on his own turf, we have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." (cleaned up)). Petitioner was not handcuffed while speaking to the officers, nor was he placed under arrest at that time. (ECF No. 8-2 at 11). The *Miranda* warnings do not apply to "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process …. It is an act of responsible citizenship for individuals to

9

give whatever information they may have to aid in law enforcement." *Miranda*, 384 U.S. at 477-78. After considering the state court record and the governing federal law, the Court finds that the state courts reasonably applied *Miranda* in concluding that no warnings were required because Petitioner was not in custody when he was interviewed at his home.

The state courts also reasonably applied *Miranda* in concluding that Petitioner was not in custody during his recorded interview. A police station is a more coercive environment than a private home, but there is no "requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Petitioner came voluntarily to the police station to speak with detectives. (ECF No. 8-2 at 11). Petitioner was not handcuffed, and he admitted that no one threatened to arrest him or his family if he did not speak with detectives. (ECF No. 8-3 at 15-16). He conceded that the detectives treated him well. (*Id.* at 16). The trial court reviewed the video recording of the interview and noted that the environment was "non-threatening" with two large windows, four chairs, and a large table. (*Id.* at 67). The court noted Petitioner and the two detectives were not crowded in the room and "looked somewhat comfortable." (*Id.* at 67-68). The trial court was satisfied that Petitioner's will was not overborne, stating that Petitioner had not been woken up at an unusual hour, he was given something to drink, and that Petitioner was "of average intelligence" and had previous encounters with law enforcement. (ECF No. 8-4 at 5-6). Accepting the trial court's factual findings as true, it was reasonable for the state courts to find that Petitioner was not in custody.

Petitioner's argument that detectives used a "question first, warn later" approach is not supported by the record. In *Missouri v. Seibert*, a plurality of the Supreme Court rejected "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and

10

counsel until interrogation has produced a confession" followed by "*Miranda* warnings and then lead[ing] the suspect to cover the same ground a second time."   542 U.S. 600, 604 (2004). Petitioner was not in custody initially; *Seibert* concerned custodial interrogations.  *Id.  Siebert* also does not apply in this situation because Petitioner was not repeating a statement that he had given prior to receiving *Miranda* warnings.  Petitioner was provided with the *Miranda* warnings as soon as "Detective DeSalvo determined defendant was no longer free to leave and that he had been involved in a crime." *Rainey I*, 2013 WL 2300989, at *6.[5]  There was no further questioning after Petitioner invoked his right to counsel.  *Id.*; (*see also* ECF No. 8-2 at 25-27).  Therefore, the state courts' decisions were neither contrary to, nor an unreasonable application of, *Seibert*'s established federal law.  Petitioner is not entitled to habeas relief.

Finally, the state courts reasonably applied federal law in concluding that Petitioner's spontaneous statement to Detective DeSalvo was admissible.  "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  "That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

Here, the trial court credited Detective DeSalvo's suppression hearing testimony over Petitioner's testimony.  (ECF No. 8-3 at 74-75).  Detective DeSalvo testified that Petitioner made incriminating statements after he informed Petitioner of the charges against him.  *Rainey I*, 2013

---

[5] The state courts relied on New Jersey state case law incorporating *Seibert*.  *State v. O'Neill*, 193 N.J. 148, 181-84 (2007).

WL 2300989, at *6.  The Appellate Division, citing *Innis*, concluded that statements that are "voluntarily blurted out by an accused in custody" are admissible when the police have not engaged in "interrogative technique[s]." *Id.* (internal quotation marks omitted) (citing *Innis*, 446 U.S at 301-02); *see also Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Volunteered statements of any kind are not barred by the Fifth Amendment … .")  The trial court believed Detective DeSalvo's testimony that he was only informing Petitioner of the charges against him when Petitioner made his statement, and it "was entitled to make the credibility determination that it did in the face of conflicting testimony, and it applied the correct law to its findings of fact and came to a reasonable conclusion." *Fahy v. Horn*, 516 F.3d 169, 196 (3d Cir. 2008).

Considering the facts as determined by the state courts, this Court makes an independent finding that, under the totality of the circumstances, Petitioner's statements were obtained in a manner consistent with the Constitution.  This Court further concludes that the state courts' decisions comply with and reasonably apply federal law; therefore, Petitioner is not entitled to habeas relief on Ground I.

## 2.    Ineffective Assistance of Counsel

Petitioner raises claims of ineffective assistance of trial counsel in Grounds II and III of the Petition, and ineffective assistance of appellate counsel in Ground V.  (ECF No. 1-3 at 16-45).  To succeed on his ineffective assistance claims, Petitioner must first "show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  He must then show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The "pivotal question" in a § 2254 *Strickland* claim "is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). This Court's review is thus "doubly deferential[.]" *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

> a. *Trial Counsel's Stipulation to SUV Evidence and Failure to Request a Spoliation Inference (Ground II & II(a))*

Petitioner's first set of ineffective assistance of counsel claims concern trial counsel's handling of evidence recovered from Petitioner's SUV. The facts below indicate the SUV was seized as evidence on November 23, 2007. (ECF No. 1-2 at 31). The State recovered blood and paint from the SUV's undercarriage as well as blood from its rear cargo area. (ECF No. 35 at 3). The SUV was "junked" on or about February 19, 2008. (ECF No. 1-2 at 37, 39). The defense did not have an opportunity to examine it. (*Id.* at 35).

At trial, the parties stipulated that the swab "recovered from the rear cargo area of the [SUV] where the body of Joyce Foster was recovered … tested presumptive for blood. And Joyce Foster was identified as the source of the DNA found." (ECF No. 8-15 at 50). They further stipulated that the blood "recovered from the undercarriage of the [SUV] near the driver's side front tire" also matched Foster's DNA, and that the yellow paint chips were "from underneath the running board of the truck." (*Id.*) Petitioner argues that trial counsel was ineffective for making these stipulations and for failing to request a spoliation inference due to the destruction of the SUV. (ECF No. 1-3 at 18).

The PCR court found that there "was no bad faith or connivance on the part of the government in the destruction of the SUV. Further, there was no prejudice in the loss or destruction of the evidence." (ECF No. 8-22 at 18). It found that Petitioner had not shown that there was a reasonable probability that the result of the trial would have been different if trial counsel had not made the contested stipulations. (*Id.*) Finally, it concluded that trial counsel's failure to request an adverse inference based on the SUV's destruction was not ineffective assistance because an inference would not have been warranted. (*Id.*)

The PCR court correctly identified *Strickland* as the governing federal law on Petitioner's ineffective assistance claims. (ECF No. 8-22 at 15).[6] Having carefully reviewed the state court record, this Court cannot say the PCR Court was objectively unreasonable in applying Supreme Court precedent to Petitioner's claims. "When a state court has applied clearly established federal law to reasonably determined facts in the process of adjudicating a claim on the merits, a federal habeas court may not disturb the state court's decision unless its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 592 U.S. 111, 112 (2020) (quoting *Harrington*, 562 U.S. at 103); *see also Mays v. Hines*, 592 U.S. 385, 392 (2021) (per curiam) ("All that mattered was whether the [state] court, notwithstanding its substantial 'latitude to reasonably determine that a defendant has not [shown prejudice],' still managed to blunder so badly that every fairminded

---

[6] The Appellate Division summarily rejected these claims on collateral review. *See Rainey II*, 2017 WL 6507743, at *3 ("We have considered defendant's contentions in light of the record and applicable legal principles and conclude they are without sufficient merit to warrant discussion in a written opinion.") "In considering a § 2254 petition, we review the 'last reasoned decision' of the state courts on the petitioner's claims." *Simmons v. Beard*, 590 F.3d 223, 231-32 (3d Cir. 2009) (quoting *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008)). Here, the Court "look[s] through" the Appellate Division's summary denial and applies AEDPA's standards to the PCR court's determination. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). The Court "presume[s] that the unexplained decision adopted the same reasoning." *Id.*

14

jurist would disagree." (second alteration in original) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009))).

The PCR court reasonably concluded that the State had not violated Petitioner's due process rights when it failed to preserve the SUV for defense inspection.  The Supreme Court has distinguished between material exculpatory evidence and potentially useful evidence in terms of defendants' Fourteenth Amendment rights:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in [*Brady v. Maryland*, 373 U.S. 83 (1963)], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.  But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

*Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).  "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  *Id.* at 58.

The PCR court reasonably concluded from the facts in the record that the SUV fell into the "potentially useful evidence" category as opposed to the "material exculpatory evidence" category.[7]  Petitioner argues that the SUV was exculpatory because it would have shown that the tire marks and paint chips from Foster's clothing did not match Petitioner's vehicle.  (ECF No. 1-3 at 25).[8]  However, "[i]t was not the State's position that [Petitioner] caused Foster's death

---

[7] The PCR Court relied on state law that incorporated *Youngblood*'s precursor *California v. Trombetta*, 467 U.S. 479 (1984).  (ECF No. 8-22 at 17) (citing *State v. Serret*, 198 N.J. Super. 21, 26 (N.J. Super. Ct. App. Div. 1984)).

[8] Petitioner does not explain how the SUV would have counteracted the blood evidence found in the car.

because he caused the injuries she sustained with his car.  Rather, the State's position was that [Petitioner] knew or should have known that she needed medical care, and that his failure to act after the accident caused her death."  (ECF No. 8-22 at 17).  Whether the SUV's tires and paint matched the marks and chips on Foster's clothing has no bearing on if Petitioner's post-accident conduct caused Foster's death.  It is plausible that Petitioner may have discovered something useful for his defense, but it is far from certain.  *See Illinois v. Fisher*, 540 U.S. 544, 548 (2004) (applying *Youngblood* bad-faith standard when "[a]t most, [defendant] could hope that, had the evidence been preserved, a fifth test … would have exonerated him").  Therefore, the PCR court appropriately identified the governing standard.

Having identified the appropriate standard, the PCR court reasonably concluded that Petitioner had not shown a due process violation.  (ECF No. 8-22 at 17-19).  Petitioner presented no evidence that the SUV was destroyed in bad faith, nor did he show that he was prejudiced by the destruction.  The blood and paint chip evidence were available for defense inspection and testing.  Two witnesses testified that they saw Petitioner put Foster into the SUV, and Petitioner admitted to Detective DeSalvo that he "could have put someone in the back of [his] truck, forgot to bring them to the hospital."  *Rainey I*, 2013 WL 2300989, at *2-3.  Even now, Petitioner concedes that he placed Foster in his vehicle: "[t]he facts are that Petitioner while intoxicated got into his vehicle and saw someone intoxicated and hy [sic] off cocaine lying in the road.  With the assistance of two eye-witnesses [sic] put victim in [h]is vehicle, with the intent to driving victim home. … Petitioner drove home while intoxicated and simply forgot she was in the vehicle."  (ECF No. 1-3 at 4 (alteration in original)).  Petitioner has not shown that he was prejudiced by the SUV's destruction.  The foundation of the manslaughter charge was not that Petitioner hit Foster, but rather that he placed her into his vehicle and left her there instead of taking her for medical

treatment.  The placement of Foster into Petitioner's vehicle is not disputed, so the SUV itself holds minimal evidentiary value.

This Court finds that the PCR court's analysis of the due process issue adhered to and reasonably applied established federal law.  It easily follows from there that the PCR court reasonably concluded that Petitioner did not satisfy the prejudice prong of *Strickland*.  (ECF No. 8-22 at 18).  There is not a reasonable likelihood that the result of the trial would have been different if trial counsel challenged the admissibility of the evidence procured from the SUV or requested a spoliation inference.  *See Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 336 (D.N.J. 2004) ("In order for the spoliation inference to apply, … the evidence destroyed or withheld [must be] relevant to claims or defenses.").  Under the "double deference" owed to the Appellate Division and PCR court, this Court concludes that the state courts reasonably applied *Strickland* to the facts of Petitioner's case.

> b.    *Trial Counsel's Failure to Retain an Accident Reconstruction Expert (Ground II(b))*

Petitioner next argues that trial counsel was ineffective for not retaining an accident reconstruction expert to "corroborate[] that it was not Petitioner's vehicle that struck the victim and caused her injuries."  (ECF No. 1-3 at 30).  "The right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued.*" Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996).  "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987).  "There is a 'strong presumption' that counsel's attention to certain issues to the

exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (citing *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)).

As recounted by the PCR court, Petitioner argues trial counsel should have retained an accident reconstructionist "to conduct in-depth collision analysis and reconstruction to identify the collision causation and contributing factors in different types of collisions, factors in different types of collisions including the role of the driver, vehicle, roadway and the environment[.]" (ECF No. 8-22 at 17).  It concluded that because the State was not charging Petitioner with Foster's death due to a vehicle accident, it was "irrelevant if an accident reconstructionist were to have been called and testified that it was … not the defendant's vehicle that struck the victim and caused her injuries." (*Id.*)  "The relevant timeframe here is the defendant's acts or omissions after any accident that occurred.  Not before.  Therefore making any need for an accident reconstruction expert obsolete." *Id.*

This was a reasonable application of *Strickland*.  Trial counsel's strategy at trial was to argue that Petitioner was at most guilty of leaving the scene of an accident and endangering an injured victim and was innocent of aggravated manslaughter.  (ECF No. 8-16 at 27, 44-45). "[E]ndangering an injured victim is … when someone causes bodily injury, leaves the scene … and by leaving the scene is rendering someone physically helpless, and otherwise unable to care for themselves.  That's what [Petitioner] did." (*Id.* at 27).  Counsel argued to the jury that Petitioner had not been charged with hitting Foster with his car and that he was on trial "because of his post-accident conduct.  He's guilty of leaving the scene.  That's endangering an injured victim." (*Id.* at 45).  An accident reconstruction expert would not fit within this strategy, and counsel is not incompetent simply because the defense strategy did not work out as well as hoped. *Strickland*, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after

conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."); *Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002) ( "[I]t is critical that courts be 'highly deferential' to counsel's reasonable strategic decisions and guard against the temptation to engage in hindsight.")

Additionally, Petitioner has not submitted any evidence to support his claim that an accident reconstructionist would have testified in the manner asserted by Petitioner. A petitioner cannot satisfy *Strickland*'s prejudice prong when he asks the court to "speculate ... as to what [the witness's] testimony would have been," instead of presenting the court with sworn testimony from that witness. *Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001). "Under usual circumstances, we would expect that such information would be presented to the habeas court through the testimony of the potential witnesses. 'Complaints of uncalled witnesses are not favored in federal habeas review.'" *U.S. ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987) (quoting *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984)). "When the allegation of the ineffectiveness of counsel centers on a supposed failure to investigate, we cannot see how, especially in the context of a habeas proceeding that collaterally attacks the state court conviction, the petitioner's obligation can be met without a comprehensive showing as to what the investigation would have produced." *Id.*; *see also Ali v. Nogan*, No. 13-7364, 2016 WL 8678443, at *7 (D.N.J. Apr. 1, 2016) ("Here, Ali's failure to include a sworn statement regarding the nature of this witness's proposed testimony is fatal to his making a *prima facie* showing of prejudice.")

The PCR court reasonably applied *Strickland* in concluding that trial counsel had a strategic reason for not calling an accident reconstructionist, and Petitioner has not shown prejudice resulting from counsel's decision. Petitioner is not entitled to habeas relief on this claim.

c.      *Failure to Advance Drug and Alcohol Use as Cause of Death (Ground III)*

Next, Petitioner argues trial counsel failed to raise a causation defense and retain an expert witness to refute the manslaughter charge. (ECF No. 1-3 at 31). "[M]edical toxicology records revealed that the victim had alcohol and cocaine in her system at the time of her death, and a failure to bring that report into question as a possible 'cause' of death was inadequate." (*Id.*) "The failure to call an independent toxicology expert to examine whether [Foster's] cocaine and alcohol synergism enhanced the risk of death from injuries that the State's expert considered to be treatable, deprived Petitioner of the full examination and research required" to challenge the State's case. (*Id.* at 32).

Trial counsel did advance a causation argument at trial. During closing arguments, she argued that the cocaine and alcohol accelerated Foster's blood loss, causing her to "[bleed] more quickly than a sober person." (ECF No. 8-16 at 31). Trial counsel vigorously contested the State's position that Petitioner's post-accident conduct caused Foster's death and instead argued that her injuries were too much to recover from, especially considering that the alcohol and cocaine in Foster's system would have accelerated her blood loss. (*Id.* at 34-35). Petitioner's argument that trial counsel did not challenge causation is meritless.

As for the failure to obtain expert testimony, trial counsel originally intended to call a forensic pathologist to testify as an expert witness, but the expert was injured in a car accident and was unable to testify at trial. (ECF No. 8-1 at 28). She attempted to obtain a new expert but was unable to find anyone suitable. (*Id.* at 30). Trial counsel discussed the situation with Petitioner prior to trial, and Petitioner made the decision to proceed to trial without an expert. (*Id.* at 31-33). The trial court offered to give trial counsel more time to find an expert, but Petitioner decided he wanted to proceed. (*Id.* at 33).

20

The PCR court concluded that Petitioner had not established that trial counsel erred in failing to present an expert witness.  It noted that the possible replacement expert, Dr. Mark L. Taff, had prepared a report opining that Foster's death "would be 'rapid' occurring in about five-ten minutes."  (ECF No. 8-22 at 16); (*see also* ECF No. 8-28 at 68).  The PCR court also quoted Dr. Taff's statements that "'survivability is a complex issue which depends on a variety of factors' and quote, 'expert opinion regarding survivability varied widely depending on who you speak to,'…"  (ECF No. 8-22 at 16); (*see also* ECF No. 8-28 at 66).  Dr. Taff also stated that Petitioner had "a lot of hurdles to get over to be completely exonerated. … This is not an easy case to defend." (ECF No. 8-28 at 68).  The PCR court concluded that trial counsel made a strategic decision not to call Dr. Taff as a witness given his "certain admissions such as survivability depends on who you speak to, that this is not an easy case to defend, et cetera."  (ECF No. 8-22 at 17).

This was a reasonable application of *Strickland*.  "Where, as here, the petitioner claims that his counsel had been ineffective for failing to call potentially important exculpatory witnesses, the assessment of trial counsel's judgment requires another layer of deference: we are required not simply to give the attorney the benefit of the doubt, but to affirmatively entertain the range of possible reasons petitioner's counsel may have had for proceeding as she did." *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014) (cleaned up) (citing *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011)).  Deciding with Petitioner's full knowledge and consent not to call a witness that may have undermined Petitioner's defense would be a reasonable, strategic decision.  "Such a decision is within the realm of reasonableness and does not violate the dictates of *Strickland*." *Porter v. Adm'r of New Jersey State Prison*, No. 20-2048, 2021 WL 2910944, at *3 (3d Cir. July 12, 2021).

Accordingly, the PCR court did not apply the first prong of *Strickland* in an objectively unreasonable manner.[9]  Petitioner is not entitled to habeas relief on this basis.

>    d.    *Ineffective Assistance of Appellate Counsel (Ground V)*

Petitioner's final ineffective assistance claim concerns appellate counsel's failure to "raise on direct appeal that failing to aid an injured victim is not an element of aggravated manslaughter." (ECF No. 1-3 at 41).  "In order to sustain an aggravated manslaughter conviction, the State must have proved beyond a reasonable doubt that Petitioner while intoxicated got into his vehicle, drove off, saw someone in the road and deliberately/purposefully mowed her down.  Decided to put her in the car and intentionally/knowingly decided to leave her in the vehicle several days until she was deceased." (*Id.* at 44-45).  In other words, Petitioner argues that appellate counsel should have challenged the sufficiency of the evidence on direct appeal.

"In determining whether appellate counsel was ineffective, the Court applies the *Strickland* standard."  *Bassett v. United States*, 188 F. Supp. 3d 411, 420 (D.N.J. 2016) (citing *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Smith v. Murray*, 477 U.S. 527, 535-536 (1986)).  To establish the prejudice prong, Petitioner must show "that there is a 'reasonable probability'—'a probability sufficient to undermine confidence in the outcome,' but less than a preponderance of the evidence—that his appeal would have prevailed had counsel's performance satisfied constitutional requirements."  *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002) (quoting *Strickland*, 466 U.S. at 694-95).

The PCR court summarily denied this claim, concluding that "a defendant does not have a constitutional right to have appellate counsel raise even non-frivolous issues that the defendant

---

[9] This Court need not consider the prejudice element because Petitioner's claim fails on the first *Strickland* element.

requests on appeal." (ECF No. 8-22 at 21). This conclusion is in line with federal law. "Appellate attorneys are not constitutionally required to raise every theoretical issue on appeal." *Bassett*, 188 F. Supp. 3d at 420 (citing *United States v. Turner*, 677 F.3d 570, 577-78 (3d Cir. 2012)). "[C]ounsel need not, and should not, raise every non-frivolous claim but rather may select among them in order to maximize the likelihood of success on appeal." *Showers v. Beard*, 635 F.3d 625, 634 (3d Cir. 2011). "Indeed, an appellate lawyer's exercise of professional judgment in omitting weaker claims is obviously of benefit to the client: the more claims an appellate brief contains, the more difficult for an appellate judge to avoid suspecting that there is no merit to any of them." *Johnson v. Tennis*, 549 F.3d 296, 302 (3d Cir. 2008) (internal citation and quotation marks omitted).

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). "[E]vidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Coleman v. Johnson*, 566 U.S. 650, 654 (2012) (per curiam) (emphasis in original) (quoting *Jackson*, 443 U.S. at 319).

The trial court instructed the jury that to prove aggravated manslaughter, the State was required to prove "[o]ne, that the defendant caused Ms. Foster's death. Two, that the defendant did so recklessly. And three, that the defendant did so under circumstances manifesting extreme indifference to human life." (ECF No. 8-17 at 20). For recklessness, the trial court informed the jury that "'a person who causes another's death does so recklessly when he is aware of and

consciously disregards a substantial and unjustifiable risk that death will result from his conduct.'"
(*Id.*)  The trial court defined "conduct" as "an action *or omission* and its accompanying state of
mind, or where relevant a series of acts and *omissions*. … Omission means failure to act."  (*Id.* at
20-21) (emphasis added).  For causation, the trial court instructed the jury that the State had to
prove "that but for defendant's conduct Ms. Foster would not have died" and that "Ms. Foster's
death must have been within the risk of which the defendant was aware."  (*Id.* at 22).  "In other
words, the State must prove beyond a reasonable doubt that Ms. Foster's death was not so
unexpected or unusual that it would be unjust to find the defendant guilty of aggravated
manslaughter."  (*Id.* at 23).  The jury was not told that "failing to aid an injured victim" was an
element of aggravated manslaughter.

Petitioner is incorrect in stating that an aggravated manslaughter conviction required proof
that he "deliberately/purposefully mowed [Foster] down."  The State did not need to prove that
Petitioner caused Foster's injuries, only her death.  The State consistently argued to the jury that
Petitioner was the "but for" causation of Foster's death because he removed her from the scene of
the accident, failed to get her medical attention, and left her in the trunk of his car.  (ECF No. 8-
21 at 14).  References to the likely cause of her injuries were "elicited to show that [Petitioner]
should have known that Miss Foster needed medical attention."  (*Id.*)  The evidence presented at
trial, viewed in the light most favorable to the prosecution, supported a guilty verdict.

Petitioner admitted to Detective DeSalvo that he operated his vehicle after he had been
"drinking a little" and that he "might have hit something with [his] truck" because he
"remember[ed] hearing a thump of some sort."  *Rainey I*, 2013 WL 2300989, at *2.  He further
admitted that "he heard someone moaning" when he got out of the truck and that he put her "in
the back of [his] truck [and] forgot to bring them to the hospital."  *Id.*   Williams testified that

24

Greer told Petitioner to take Foster to the hospital after they helped place Foster in Petitioner's vehicle. *Id.* at *3. Dr. Hua testified that Foster could have survived her injuries if she had been taken to a hospital for treatment. *Id.* at *4.

From this evidence, a reasonable jury could have concluded that Petitioner knew Foster was alive and injured in the street, knew that she needed medical treatment, and that Petitioner failed to get her any medical treatment. Instead, he parked his car at his home and left Foster alone in the SUV. A reasonable jury could have concluded that Petitioner would have known that failing to get medical attention for a severely injured person would run the risk of death. A reasonable jury could also conclude that Petitioner disregarded that risk by putting Foster in his car and leaving her alone for a day and a half. Therefore, Petitioner's sufficiency of the evidence argument for the manslaughter charge would fail, and the PCR court reasonably concluded that appellate counsel was not ineffective for failing to raise this claim on direct appeal.

e.    *Cumulative Error*

Petitioner asserts that trial and appellate counsels' cumulative errors deprived him of a fair trial. (ECF No. 1-3 at 46-47). "[E]rrors that individually do not warrant habeas relief may do so when combined." *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The Court has reviewed the PCR court's resolution of Petitioner's ineffective assistance of counsel arguments with the appropriate AEDPA deference and concluded its decisions were not contrary to or an unreasonable application of federal law. Its decisions were also reasonable based on the facts at trial. "[ ] Petitioner has (i) failed to cast doubt over the proofs of his guilt, and (ii)

failed to establish that he has suffered any prejudice from the purported errors." *Thomas v. Johnson*, No. 18-0710, 2022 WL 603002, at *28 (D.N.J. Mar. 1, 2022), *certificate of appealability denied sub nom Thomas v. Adm'r New Jersey State Prison*, No. 22-1540, 2022 WL 4363552 (3d Cir. Aug. 30, 2022).  "Thus, Petitioner has not proven that the alleged cumulative errors had 'a substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008)).  The Court will deny habeas relief on this ground.

### 3.    Improper Expert Testimony (Ground IV)

In Ground IV, Petitioner argues that Dr. Hua's testimony that Foster would have survived if she had been taken to a hospital exceeded the scope of permissible expert testimony and violated Petitioner's Fourteenth Amendment right to due process.  (ECF No. 1-3 at 34).  Trial counsel objected to Dr. Hua's proposed testimony before it was presented to the jury, arguing that he should be limited to testifying about "the absence [or] presence of injuries, as well as the cause of death. Anything beyond that is speculation … ."  (ECF No. 8-14 at 27).  The trial court overruled the objection.  (*Id.* at 42).

At trial, Dr. Hua testified the cause of death was blunt injury to Foster's torso and that death would not be immediate, which Dr. Hua defined as occurring in "less than five, 10 minutes." (*Id.* at 98; ECF No. 8-15 at 1).  He later stated that he had come across people in his practice who had survived after receiving more severe injuries than Foster.  (ECF No. 8-15 at 5).  The State elicited Dr. Hua's opinion on cause of death through a hypothetical:

> I'm going to ask you to give an opinion within a reasonable degree of medical and scientific certainty as to whether this would be considered a homicide.
>
> ….

> An individual is driving a motor vehicle. They run over an individual in the street. They get out of the car. The person who is run over is still alive at that point. They place the injured person into the rear of their truck. They do not call for medical assistance or police assistance. They drive the truck away from the scene, with the person in the back of the truck, again without contacting the police or medical services, or anyone for that matter. And that person who is the [sic] in the back of the truck suffered fractured ribs and a lacerated liver, blunt force trauma to the torso, no head injury, no heart injury, no aorta injury. Would you have an opinion assuming those facts as true as to whether that particular hypothetical would be to a reasonable degree of medical certainty a homicide?

(*Id.* at 5-6). After the State clarified that the hypothetical driver "[n]ever went for medical treatment," Dr. Hua opined that the cause of death would be considered a homicide. (*Id.* at 6).

The Appellate Division rejected Petitioner's argument on direct appeal on state law grounds. *Rainey I*, 2013 WL 2300989, at *4. This Court reviews Petitioner's Fourteenth Amendment claim *de novo* as the Appellate Division did not address the federal claim. *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

"[T]he admission of expert testimony in a state trial presents a question of state law— unless, of course, the evidence violates due process or some other federal constitutional right[.]" *Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001) (footnote omitted). To prevail on his due process claim, Petitioner "must prove that he was deprived of fundamental elements of fairness in his criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (cleaned up). "The Supreme Court has 'defined the category of infractions that violate "fundamental fairness" very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)). Furthermore, even if a trial court's admission of evidence is erroneous to the point of violating the due process guarantees of the Constitution, it must have had a "'substantial and

27

injurious effect or influence in determining the jury's verdict'" to justify habeas relief. *Kontakis v. Beyer*, 19 F.3d 110, 120 (3d Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Petitioner's chief contention regarding Dr. Hua is that his answer to the State's hypothetical usurped the jury's role in deciding guilt because "the question had the functional equivalent of asking Dr. Hua if [Petitioner] was guilty." (ECF No. 1-3 at 40). He asserts that allowing Dr. Hua to testify in this manner was more prejudicial than probative. (*Id.*) This Court concludes that Petitioner has not met the high bar necessary to show that the admission of Dr. Hua's testimony deprived Petitioner of the fundamental elements of fairness.

Petitioner contends that allowing Dr. Hua to testify that the cause of death in the State's hypothetical would be considered a homicide was tantamount to testimony that Petitioner was guilty. However, Petitioner misconstrues Dr. Hua's use of the word "homicide" in his answer. The State made clear through its questions that Dr. Hua was using the medical definition of "homicide" in his testimony to refer to the cause of death, not the legal definition. (ECF No. 8-15 at 2). "The medical definition of homicide has nothing to do with the legal definition which usually carry [sic] intention involved. In this case, homicide is because either you did something … or you did not do something." (*Id.*) Dr. Hua reviewed the other possible causes of death, such as natural causes, accident, suicide, etc. (*Id.* at 3-4). "Dr. Hua's opinion that this was a homicide was necessary to distinguish what occurred from an unfortunate 'accident' and was an appropriate expert opinion as to the cause of Foster's death." *Rainey I*, 2013 WL 2300989, at *4. At no time did Dr. Hua express an opinion as to whether he personally believed Petitioner was guilty. *See Aquilina v. Anderson*, No. 17-2243, 2017 WL 6209208, at *6 (D.N.J. Dec. 7, 2017) (finding that expert did not opine on ultimate issue of guilt in testifying that cause of death was homicide).

28

Trial counsel cross-examined Dr. Hua regarding his opinion, providing more hypothetical situations to see whether he would classify them as homicides as well.  (ECF No. 8-15 at 30-34). The trial court emphasized the difference between the medical and legal definitions stating that it would provide the jury with "the legal definition as to certain things" and would not "be using the medical definition."  (*Id.* at 7).  During jury instructions, the trial court reminded the jury that it was "not bound by" Dr. Hua's opinion and should "give it the weight to which you deem it entitled. Whether that be great, or slight, or you may reject it."  (ECF No. 8-17 at 2).  "It is well established that, absent extraordinary circumstances, jurors are presumed to follow the instructions given them by the court."  *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014).  "The argument has long since been laid to rest that, where an expert expresses an opinion on an assumed state of facts, he is usurping the province of the jury. … [T]he jury still has to determine the controverted issue of whether the assumption which the witness has made is correct."  *United States v. Morgan*, 554 F.2d 31, 33 (2d Cir. 1977).

The fact that the State's hypothetical incorporated the facts of the case does not mean that it was inappropriate for Dr. Hua to answer.  *See id.* ("Opinion testimony of expert witnesses has traditionally been given in response to hypothetical questions based upon the evidence in the case … .")  "Time and again, experts are asked hypothetical questions which assume the very facts upon which the defendant's guilt is predicated.  If the question is based upon the evidence, it may be permitted in the exercise of the trial judge's discretion."  *Id.*; *see also United States v. Latysheva*, 162 F. App'x 720, 725 (9th Cir. 2006) (holding trial court did not abuse its discretion by allowing expert testimony in response to hypothetical questions).  Here, the State presented Dr. Hua's testimony at the end of its case, and the facts of the hypothetical were derived from the previously presented testimony and other evidence.  *Rainey I*, 2013 WL 2300989, at *4 (noting expert opinion

29

provided in response to hypotheticals must be "formed assuming the facts and circumstances adduced only at trial").

The cases cited by Petitioner in support of his argument are distinguishable from the facts in this case. Petitioner relies on civil cases where the courts concluded that it would be improper to allow experts to provide opinions on another witness's credibility. (ECF No. 1-3 at 38-39 (citing *Nichols v. Am. Nat. Ins. Co.*, 154 F.3d 875, 883 (8th Cir. 1998) (holding district court erred by allowing expert witness to testify as to plaintiff's veracity and credibility*); Rodriguez v. Wal-Mart Stores, Inc.*, No. A-4137-14T3, 2017 WL 1719153, at *8 (N.J. Super. Ct. App. Div. Apr. 27, 2017) (holding expert testimony that plaintiff was a "malingerer" was not permissible)). Here, Dr. Hua did not opine on anyone's credibility, including Petitioner's.  Dr. Hua's answer to the hypothetical did not render Petitioner's trial fundamentally unfair.

Petitioner's claim also fails to the extent he argues Dr. Hua's testimony that Foster could have survived if she had received medical care was so prejudicial as to deprive him of a fundamentally fair trial.  (ECF No. 1-3 at 37-38); *see also Payne v. Tennessee*, 501 U.S. 808 (1991) (holding that Due Process Clause can in certain cases protect against introduction of unduly prejudicial evidence).  "Here, Dr. Hua's expert testimony was required to assist the jury in analyzing the significance of the time sequence in relation to the severity of Foster's injuries." *Rainey I*, 2013 WL 2300989, at *4.  His opinion about Foster's survivability "was a legitimate expert medical opinion and was properly admitted in evidence." *Id.*; *see also Thompson v. Slayton*, 334 F. Supp. 352, 354 (W.D. Va. 1971) (holding expert testimony that the victim would be permanently paralyzed because of the gunshot wounds inflicted upon him by the defendant was not overly prejudicial).  Trial counsel zealously cross-examined Dr. Hua on this opinion, pointing out that he had never treated a living person with fractured ribs, a lacerated liver, punctured lungs,

and who had consumed cocaine and alcohol.  (ECF No. 8-15 at 24).  She pointed out that Dr. Hua

did not know any of Foster's medical history and was unaware of several variables that may have

impacted Foster's survivability.  (*Id.* at 25-28).  In short, trial counsel's thorough cross-

examination was the proper method to challenge Dr. Hua's opinions and conclusions.  *See United

States v. Mathis*, 264 F.3d 321, 328 (3d Cir. 2001) (noting "vigorous cross-examination …

significantly mitigated [the] risk of unfair prejudice").  Petitioner is not entitled to habeas relief on

this claim.

**4.      Failure to Conduct an Evidentiary Hearing (Ground VI)**

Petitioner's final ground for relief is an allegation that the PCR court erred in failing to

grant him an evidentiary hearing.  (ECF No. 1-3 at 45).  "[T]he federal role in reviewing an

application for habeas corpus is limited to evaluating what occurred in the state or federal

proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's

*collateral* proceeding does not enter into the habeas proceeding."  *Hassine v. Zimmerman*, 160

F.3d 941, 954 (3d Cir. 1998) (emphasis in original), *cert. denied*, 526 U.S. 1065 (1999); *see also

Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004) ("[A]lleged errors in [state] collateral

proceedings ... are not a proper basis for habeas relief from the original conviction.").

The Court has reviewed Petitioner's claims on their merits and found that the state courts

did not reach decisions that were contrary to, or an unreasonable application of, established federal

law.  Therefore, the Court will deny the petition.[10]

---

[10] A district court is required to hold an evidentiary hearing only when the petitioner presents a
*prima facie* showing that 'a new hearing would have the potential to advance the petitioner's
claim.'"  *Porter v. Adm'r of N.J. State Prison*, 2021 WL 2910944, at *4 (3d Cir. July 12, 2021)
(quoting *Siehl v. Grace*, 561 F.3d 189, 197 (3d Cir. 2009)).  "In other words, th[e] Court must first
determine whether … the last state court to reach the issue on its merits, issued a decision that was

### III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are all without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

### IV. CONCLUSION

For the reasons stated above, this Court will deny Petitioner's Petition and deny a certificate of appealability. An appropriate order follows.

Date:_____February 3___, 2025                    _____

                                                                                     Hon. Susan D. Wigenton
                                                                                     United States District Judge

---

contrary to federal law, an unreasonable application of federal law, or ... based on an unreasonable determination of the facts." *Murphy v. Att'y Gen. of N.J.*, 2021 WL 3144641, at *4 (D.N.J. July 26, 2021), *reconsideration denied*, 2022 WL 1213354 (D.N.J. Apr. 25, 2022). "If no, the inquiry ends there because Petitioner has not satisfied the § 2254(d) standard." *Id.* Upon review of the parties' papers and other relevant materials, the Court finds that the state courts did not reach decisions that were contrary to, or an unreasonable application of, established federal law. Accordingly, this Court will deny habeas relief without an evidentiary hearing.